1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CONNOR WEBB,

                            Plaintiff,

         v.

CITY OF VANCOUVER, et al.,

                            Defendants.

CASE NO. C19-6081 BHS

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S
MOTIONS TO CONTINUE AND
TO COMPEL

This matter comes before the Court on Defendants the City of Vancouver ("the City") and Jeff Starks's ("Starks") (collectively "Defendants") motion for summary judgment, Dkt. 21, and Plaintiff Connor Webb's ("Webb") motions to defer consideration of the summary judgment motion, Dkt. 26, and to compel discovery, Dkt. 30. The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby grants the motion for summary judgment and denies the motions to continue and to compel for the reasons stated herein.

## I.   PROCEDURAL HISTORY

On November 14, 2019, Webb filed a complaint against the City, Starks in his individual capacity and as an employee of Vancouver Police Department ("Vancouver

PD"), and James McElvain ("McElvain") in his official capacity as Chief of Police, alleging violations of both state and federal law. Dkt. 1. On December 26, 2019, the current Defendants and McElvain moved to dismiss all of the state law claims and all claims against McElvain. Dkt. 11. On January 16, 2020, the parties stipulated to dismissal of those claims. Dkt. 12. Webb's remaining claims are for violation of his Fourth and Fourteenth Amendment rights brought pursuant to 42 U.S.C. § 1983.

On September 3, 2020, Defendants moved for summary judgment. Dkt. 21. On September 21, 2020, Webb responded and filed a motion to extend the deadline to respond or to defer consideration of the motion for summary judgment pursuant to Fed. R. Civ. P. 56(d) and Local Rule 7(j). Dkts. 25, 26. On September 25, 2020, Defendants replied to Webb's response. Dkt. 27. On September 30, 2020, Defendants responded to Webb's motion to defer. Dkt. 29. Webb did not reply, but on October 22, 2020, moved for leave to file a motion to compel pursuant to Fed. R. Civ. P. 37. Dkt. 30. On October 28, 2020, Defendants responded. Dkt. 31. Webb did not reply.

## II.  FACTUAL BACKGROUND

This case arises out of Starks's July 14, 2017 arrest of Webb on suspicion of driving under the influence ("DUI") of marijuana.

**A.      Starks's Training and Experience**

Starks began working in law enforcement in 1994. Dkt. 23 at 2.[1] He worked continuously for the Vancouver PD from July 2000 through April 30, 2020 and is currently employed by the Port of Portland Police Department. *Id.*

During his employment with the Vancouver PD, some of Starks's performance evaluations reflected the number of DUI traffic stops and arrests he had performed. Dkt. 25-3 at 31. For example, he testified that in 2006, he received a positive performance review for having the "the highest number of DUI arrests previously." *Id.* at 29. In 2007, a performance development document reflected that his DUI numbers were "above the minimum of 50 and are not as high as his DUI numbers in previous years" and his "traffic stop numbers [we]re below the minimum number of 600 traffic stops." *Id.* at 30–31. During periods in 2009, 2011, and 2012, his performance objectives included writing 100 citations within the year, with a notation in September of 2012 that he needed to increase citations to meet the goal. *Id.* at 34–36, 39–41. And in 2016, an evaluation included an adverse comment from the supervising lieutenant about Starks's having made only one traffic stop and one DUI arrest/assist on Super Bowl Sunday in 2015. *Id.* at 46–47.

Starks declared that he is a certified Drug Recognition Expert ("DRE"), with "extensive training as it pertains to the effects of drugs and alcohol on individuals operating motor vehicles." Dkt. 23 at 2. His CV lists multiple instances of formal training

---

[1] The Court cites ECF page numbering throughout.

related to DRE and/or Standardized Field Sobriety Testing ("SFST") yearly between

2013 and 2019. *Id*. at 9–11. Starks declared that he was trained on how alcohol and drugs,

including marijuana, affect an individual and the ability to drive safely. *Id*. at 4. He was

trained that alcohol "slow[s] down the body's functions and the way the body reacts,

including but not limited to heartrate, blood pressure, the slurring of speech, and a

depressed ability to react," and would cause signs of horizontal or vertical gaze

nystagmus ("the involuntary jerking of the eye"), as well as affect gait. *Id*. at 4. He

declared that

> [c]onversely, a cannabis user, especially a person who has developed a
> tolerance to that drug, may appear to perform field sobriety tests with little
> to very little clues; however, clinical markers are highly identifiable. These
> clinical markers include body tremors, eyelid tremors, impaired perception
> of time and distance, marked reddening of conjunctiva, odor of marijuana
> and debris in the mouth.

*Id*. He also declared that according to his training that following first inhalation,

"depending on the strength of the cannabis a [sic] marijuana joint, a person's THC

concentration can spike immediately to 8.1 ng/mL, but diminish rapidly." *Id*. at 6.

Washington law provides in relevant part that a person is guilty of driving under the

influence if the person drives and "(b) [t]he person has, within two hours after driving, a

THC concentration of 5.00 or higher as shown by an analysis of the person's blood made

under RCW 46.61.506; or (c) while the person is under the influence of or affected by

intoxicating liquor, marijuana, or any drug." RCW 46.61.502(b), (c).

Starks declared that according to his training,

> the general indicators of cannabis impairment include: body tremors,
> disorientation, debris in mouth, eyelid tremors, impaired perception of time

and distance, increased appetite, marked reddening of conjunctiva (bloodshot eyes), odor of marijuana, possible paranoia, and relaxed inhibitions. One does not need all of these indicators to be present to be considered impaired by cannabis.

*Id.* at 5, 35. However, when asked at deposition how Washington defines impairment, Starks did not provide a definition. His responses included that Webb "was impaired" which was "why I arrested him, and I had the probable cause" and that "I don't have the definition in front of me, but all of my arrests regarding impaired drivers have fallen into that category of the legal definition that I do not have in front of me." Dkt. 25-3 at 12–13.

**B.    Arrest in Question**

On July 14, 2017, Webb was driving in Battle Ground, Washington. Dkt. 25-2, ¶ 1. Starks was assisting the city of Battle Ground with traffic enforcement as a DRE through an interlocal agreement with the Vancouver PD. Dkt. 23 at 2.

At 11:19 p.m., Starks saw that Webb's vehicle was travelling north on SW 10th Avenue with a headlight out. Dkt. 23 at 16. Starks made a U-turn to follow Webb's vehicle. *Id.* at 17. Webb declares that he was "fully in control of [his] faculties and was driving [his] car in accordance with the traffic laws." Dkt. 25-2, ¶ 2.

Starks waited behind Webb's vehicle at the intersection of SW 10th Avenue and West Main Street with the intent to activate his emergency lights once the vehicle cleared the intersection. Dkt. 23 at 17. He noted in his police report that the driver and passenger windows of his patrol vehicle were rolled down, the driver's side window of Webb's vehicle was rolled down, and he could smell a strong odor of marijuana. *Id.* Webb testified that his windows were not rolled down, but his sunroof was open. Dkt. 22-1 at

12. Webb testified that he had taken a "minimal" puff from a marijuana joint while driving, and he believed he had done so while stopped at the light. *Id*. at 23–25.

Starks activated his lights at the intersection to initiate a traffic stop. Dkt. 23 at 2. Webb proceeded along West Main Street and turned right on NW 12th Avenue. Dkt. 23 at 2–3. Starks declared that Webb turned right again on NW 1st Street before pulling over. Dkt. 23 at 2–3, 6–7. His police report does not mention NW 1st Street, but states that after turning north on NW 12th Avenue "the vehicle finally stopped behind The Jack in the Box at that location." *Id*. at 17. Webb testified that he continued driving along NW 12th Avenue and then turned into a parking lot across from a Jack in the Box. Dkt. 25-3 at 69.

Starks declared that though "there are no parking spaces on the north side of Main Street, there was ample room for Mr. Webb to pull his car over, but he did not do so." Dkt. 23 at 3. He further declared that he has "pulled over many motorists on similar roads with reduced shoulder space without the driver continuing to drive," which is "especially true since the passage of the state law requiring drivers approaching emergency vehicles to switch lanes which was in 2007." *Id*. at 3. Starks declares that Webb's "actions of continuing to drive on West Main Street instead of immediately pulling over were consistent with a cannabis user with impaired perception of distance." *Id*. at 3. Starks estimated that Webb travelled 1088 feet after Starks activated his lights before pulling over. *Id*. at 26. However, Starks also testified that he did not observe any signs of impairment in the way Webb operated his vehicle. Dkt. 25-3 at 53.

1       Webb testified that he did not pull over on Main Street because he did not think

2  there was enough room on the shoulder—"over half my car was going to be sticking out

3  into Main Street." Dkt. 25-3 at 65. He testified that he did not pull over on NW 12th

4  Avenue because he did not want to block the road. *Id*. at 65, 69.

5       Webb declared that he believes Starks was driving an unmarked car. Dkt. 25-2,

6  ¶ 3. Starks testified that he was either driving an "SUV with overhead lights or it was an

7  unmarked, semi-marked Chevy Impala with inside lights, meaning the lights were inside

8  and in the grille, well illuminated." Dkt. 25-3 at 49. He later specified that the Impala was

9  identified through small markings "on the side passenger windows." *Id*. at 50. He

10  testified that if someone was looking at the Impala in their review mirror, it may not have

11  been immediately apparent that it was a police vehicle if the lights were not illuminated.

12  *Id*.

13       Starks's police report states that after Webb parked, he observed Webb moving

14  around in his seat and appear to put something in his mouth as Starks approached. Dkt.

15  23 at 17. Webb testified that, after he parked, he rolled down his window and put the joint

16  he had been smoking back in the center console of his car. Dkt. 22-1 at 23–24, 30. He

17  testified that he put gum in his mouth "at some point while [he] was in the car" to "mask

18  the smell of [his] - - of the odor of [his] breath at that time." *Id*. at 31–32.

19       Starks told Webb he had smelled a strong odor of marijuana coming from his

20  vehicle, Dkt. 23 at 17, and Webb told Starks where the marijuana was and that he had

21  smoked a very minimal amount, Dkt. 22-1 at 24, 34. Starks's Drug Recognition

22  Evaluation Report states that Webb said he was driving home from his girlfriend's house

and smoking a joint while driving but "only had a couple of puffs before [Starks] pulled

him over." Dkt. 23 at 30. Starks observed that Webb's eyes were bloodshot red. *Id*. at 17.

Starks then instructed Webb to begin sobriety tests. *Id*. Webb testified he does not believe

Starks told him the testing was voluntary. Dkt. 25-3 at 70–71.

Starks had Webb perform four field sobriety tests—the horizontal gaze nystagmus

test, the walk-and-turn, the one-leg stand, and the modified Romberg balance test. Dkt.

25-3 at 27, 55. Starks declares that the tests are used "to observe visual clues of

impairment by drivers" and "are not 'pass/fail' meaning that one does not 'pass' a [field

sobriety test].'" Dkt. 23 at 4.

At deposition, Starks was shown an exhibit that he confirmed "appears to be" a

page from his DRE training manual, which indicated that for people suspected of being

under the influence of cannabis, performance will be impaired on the walk-and-turn, one-

leg stand, modified Romberg balance test, and finger-to-nose test. Dkt. 25-3 at 17. Starks

testified that while that is what the manual stated, "that's not true in all cases." *Id*. at 18.

He explained that "my experience has shown me that some folks perform these tests very

well and they don't exhibit all of these signs on these particular tests." *Id*. at 18.

First, Starks conducted the horizontal gaze nystagmus test. Starks was trained that

the nystagmus test does not detect marijuana impairment, and Webb displayed no "clues"

when performing this test. Dkt. 23 at 4–5, 18. Starks testified that he did not believe he

had probable cause to arrest Webb at the conclusion of this test. Dkt. 25-3 at 54.

Next, Starks conducted the walk-and-turn test. Starks testified that two clues on

this test indicates impairment, and he observed two clues—that Webb stepped off the line

1    and missed touching heel-to-toe on the same step. Dkt. 25-3 at 20–21. He elaborated in

2    his declaration that "[m]issing heel to toe and stepping off of the line are two distinct

3    clues – as a police officer I have been trained that these are distinct events and doing

4    either counts as one clue and doing both counts as two clues." Dkt. 23 at 5. Chet Decker

5    ("Decker"), Webb's DUI and Drug Recognition Expert, declares that Starks "was not

6    following proper DRE procedures when he counted this as two clues." Dkt. 25-1, ⁋ 29.

7    Starks testified that there was not an actual line on the roadway, and he instructed Webb

8    to follow an imaginary line as is his practice when a line is not present. Dkt. 25-3 at 21–

9    23.

10          Webb declared that he "believe[s] [he] performed the walk and turn test correctly"

11   and does not believe that he missed heel-to-toe contact during any step or stepped off the

12   line during the test. Dkt. 25-2, ⁋ 4. His deposition testimony was less certain—he

13   testified that he did not believe that he stepped off the line, but "If I missed my heel to toe

14   on the second step like it says in the report then - - and I continued the rest and did it 100

15   percent past that, then I agree to that." Dkt. 25-3 at 73. Starks testified that at the

16   completion of the walk-and-turn test, he did not believe he had probable cause to arrest

17   Webb. *Id*. at 55.

18          Next, Starks had Webb perform the one-leg stand test. Dkt. 25-3 at 55. In this test,

19   the subject is asked to stand on one leg and count thirty seconds. *Id*. at 24–26. Starks

20   testified that he did not observe any impairment clues when Webb performed the one-leg

21   stand test. Dkt. 25-3 at 25. After the one-leg stand test, Starks testified that he believed he

22   had probable cause to arrest Webb but confirmed his belief with the modified Romberg

1  balance test, where Webb exhibited "[e]yelid tremors, which are consistent with cannabis

2  impairment. *Id*. at 56; Dkt. 23 at 18.

3      Starks testified that he performed the modified Romberg balance test to determine

4  if Webb could estimate time and that the test showed no distortion in Webb's ability. Dkt.

5  25-3 at 10. Starks testified that prior to making the arrest, he did not observe any

6  evidence that Webb's perception of time was distorted. *Id*. at 10.

7      After these tests, Starks asked Webb to open his mouth and stick out his tongue

8  and observed that Webb's tongue was coated green and his taste buds were raised. Dkt.

9  23 at 18.[2] Starks then informed Webb he "believed he was under the influence of

10  marijuana and placed his [sic] under arrest for DUI without incident." *Id*.

11      Starks transported Webb to the police station and continued testing Webb for

12  impairment including through vital signs and eye responses, all of which he found

13  indicated marijuana impairment. *Id*. at 18–19, 24. Webb submitted to a voluntary blood

14  draw at 12:15 a.m. *Id*. at 19, 24; Dkt. 22-1 at 66. Starks noted in his Drug Influence

15  Evaluation form that Webb's attitude was cooperative, his coordination was good, and his

16  speech was fair. Dkt. 23 at 23.

17      Starks issued Webb a criminal citation, which included the narrative from his

18  police report, and advised him of his upcoming court date. *Id*. at 19; Dkt. 15, ⁋ 4.106.

19

20      [2] Defendants argue these are also signs of marijuana impairment, citing Starks's
   declaration and police report. Dkt. 21 at 7 (citing Dkt. 23 at 5, 35). The declaration states that
21  "debris in mouth" is a sign of impairment and does not mention taste buds. Dkt. 23 at 5, 35.
   Starks's "Drug Influence Evaluation Narrative" lists the green-coated tongue and raised taste
22  buds as "Signs of Ingestion." *Id.* at 30.

Starks's follow-up report recommended "suspend pending blood tests [sic] results." Dkt. 23 at 21. On September 5, 2017, Webb filed a motion to dismiss for lack of probable cause through counsel. Dkt. 22-4. On September 14, 2017, the City Attorney's Office stipulated to the motion, and the Battle Ground Municipal Court ordered the case dismissed for lack of probable cause. Dkt. 22-5. On October 16, 2017, blood testing results determined that Webb's THC level was 1.9 ng/mL. Dkt. 22-6 at 2.

On February 27, 2019, through counsel, Webb submitted a complaint to the Vancouver PD's Professional Standards Unit, complaining that Starks had arrested Webb without probable cause. Dkt. 24 at 2, 5. On March 7, 2019, Lieutenant Kevin Hatley of the Professional Standards Unit submitted an analysis of the complaint to Assistant Police Chief Mike Lester ("Lester"). Dkt. 24 at 2; Dkt. 22-2 at 15–16. On March 8, 2019, Lester closed the complaint without further action. Dkt. 22-2 at 14.

## III.  DISCUSSION

Webb alleges Starks violated his Fourth Amendment rights through arresting him without probable cause and unlawfully searching and seizing his vehicle and violated his Fourteenth Amendment rights by wrongfully prosecuting him, subjecting him to malicious abuse of process, and failing to disclose exculpatory evidence. Dkt. 1. Webb also alleges Starks violated both his Fourth and Fourteenth Amendment rights through a search of Webb's oral cavity. *Id.* Further, Webb alleges that the City may be held liable for the wrongful arrest under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978). *Id.*

**A.      Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence

1    at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

2    *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

3    nonspecific statements in affidavits are not sufficient, and missing facts will not be

4    presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

5    **B.     Analysis**

6          Defendants move for summary judgment on each of Webb's claims. Defendants

7    argue that each of Webb's claims against Starks fail either because Starks did not violate

8    Webb's constitutional rights or because Starks has qualified immunity.

9          **1.     Qualified Immunity**

10         Defendants in a § 1983 action enjoy qualified immunity from damages for civil

11   liability as long as their conduct does not violate clearly established statutory or

12   constitutional rights of which a reasonable person would have known. *Harlow v.*

13   *Fitzgerald*, 457 U.S. 800, 818 (1982). In analyzing a qualified immunity defense, the

14   Court must determine: (1) whether a constitutional right would have been violated on the

15   facts alleged, taken in the light most favorable to the party asserting the injury; and (2)

16   whether the right was clearly established when viewed in the specific context of the case.

17   *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v.*

18   *Callahan*, 555 U.S. 223, 236 (2009). "The plaintiff bears the burden of proof that the

19   right allegedly violated was clearly established." *Tarabochia v. Adkins*, 766 F.3d 1115,

20   1125 (9th Cir. 2014) (citation and quotation marks omitted).

21         The Supreme Court has repeatedly held that clearly established law may not be

22   defined "at a high level of generality." *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152

ORDER - 13

1   (2018); *District of Columbia v. Wesby*, 138 S. Ct. 577, 586, 589 (2018); *City of San*

2   *Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015). Instead, courts must look at the

3   "particular context" at issue and determine the question within the "specific context" of

4   the case. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). "The relevant dispositive

5   inquiry in determining whether a right is clearly established is whether it would be clear

6   to a reasonable officer that his conduct was unlawful in the situation he confronted."

7   *Saucier*, 533 U.S. at 202. "Of course, there can be the rare 'obvious case,' where the

8   unlawfulness of the officer's conduct is sufficiently clear even though existing precedent

9   does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (quoting *Brosseau v.*

10   *Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). "But 'a body of relevant case law' is

11   usually necessary to 'clearly establish the answer' with respect to probable cause." *Id.*

12   (quoting *Brusseau*, 543 U.S. at 199) (internal quotation marks omitted)). In analyzing a

13   qualified immunity defense, courts are "permitted to exercise sound discretion in

14   deciding which of the two prongs of the qualified immunity analysis should be addressed

15   first in light of the circumstances in the particular case at hand." *Pearson*, 55 U.S. at 236.

16                 **a.**       **Probable Cause for Arrest**

17          Probable cause is established "when, 'under the totality of circumstances known to

18   the arresting officers, a prudent person would have concluded that there was a fair

19   probability that [the suspect] had committed a crime.'" *United States v. Lopez*, 482 F.3d

20   1067, 1072 (9th Cir. 2007) (citation omitted). "To determine whether an officer had

21   probable cause for an arrest, "we examine the events leading up to the arrest, and then

22   decide whether these historical facts, viewed from the standpoint of an objectively

1 reasonable police officer, amount to probable cause." *Wesby*, 138 S. Ct. at 586 (quoting

2 *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotations omitted)). Courts

3 should follow a totality-of-the-circumstances test, "considering all of the surrounding

4 circumstances" including the plausibility of any innocent explanations put forward. *Id.* at

5 588.

6      Webb argues that facts material to probable cause are in dispute, so the issue must

7 go to the jury. Dkt. 25 at 14–15. He cites *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th

8 Cir. 1984) ("*McKenzie*") for the proposition that probable cause in a § 1983 action is

9 generally a question for the jury, and summary judgment is appropriate "only if no

10 reasonable jury could find that the officers did not have probable cause to arrest." Dkt. 25

11 at 14–15. Defendants argue that the standard for resolving probable cause in a § 1983

12 case has changed since *McKenzie* and no material facts are disputed, so the Court may

13 resolve the issue of probable cause as a matter of law. Dkt. 27 at 4.

14      Defendants are correct that the standard has changed. "After *Hunter* [*v. Bryant*,

15 502 U.S. 224 (1991)], [the Ninth Circuit] altered its approach to resolving questions of

16 qualified immunity." *Conner v. Heiman*, 672 F.3d 1126, 1131 (9th Cir. 2012) (citing *Act

17 Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)). "Under the current approach,

18 a district court should decide qualified immunity as a matter of law when 'the material,

19 historical facts are not in dispute, and the only disputes involve what inferences may be

20 drawn from those historical facts.'" *Id.* (quoting *Peng v. Mei Chin Penghu*, 335 F.3d 970,

21 979–80 (9th Cir. 2003)).

22

Defendants correctly identify the following facts as undisputed: (1) that Starks smelled marijuana coming from Webb's vehicle, (2) that Webb failed to immediately pull over when Starks activated his emergency lights, (3) that Webb put away his marijuana and put gum in his mouth after pulling over, (4) that Webb's eyes were bloodshot, (5) that Webb had eyelid tremors, raised taste buds, and green coating on his tongue, and (6) that Webb told Starks he smoked marijuana while driving. Dkt. 21 at 12. Defendants also argue that Webb's missteps on the walk-and-turn test are undisputed, *id.*, but the Court disagrees in part.

In essence, Webb argues that these facts are insufficient for probable cause in the context of Webb's "excellent" driving and performance on the SFSTs. Dkt. 25 at 15. Webb identifies the following as disputed material facts: (1) whether Starks was patrolling in an unmarked car, (2) whether as soon as Starks initiated a traffic stop, Webb took the first right turn to find a safe place to park, (3) whether Webb stepped off the line or missed heel-to-toe contact during the walk-and-turn test, (4) whether stepping off the line and missing heel-to-toe contact on the same step can be counted as two "clues" indicating impairment, (5) the relevance of whether Webb's eyes converged in post-arrest testing, (6) whether Starks was a competent DUI investigator, and (7) whether it was reasonable for Starks to think he did not yet have probable cause at the completion of the walk-and-turn test, but determine that he did have probable cause after the one-leg stand test. Dkt. 25 at 15–16. The Court addresses each of Webb's points in turn.

First, Defendants do not dispute that Starks was likely patrolling in a car with minimal markings, and Webb does not assert that the car's nature prevented him from

1  realizing he was being stopped, so any dispute of fact is not material. Second, the relevant

2  dispute is over the distance travelled is what reasonable inference may be drawn from

3  Webb's driving, not the distance he actually drove. *See Conner*, 672 F.3d at 1131 (the

4  Court should decide reasonable inferences as a matter of law when the material facts are

5  not in dispute). Third and fourth, the Court addresses the issue of the walk-and-turn test

6  in more detail below. Fifth, the Court agrees with Webb that whether his eyes converged

7  in post-arrest testing is not material to probable cause for the arrest. *See* Dkt. 25 at 10.

8  Sixth and seventh, whether Starks was a competent DUI investigator and whether Starks

9  developed his belief that probable cause was present at a logical point during the stop are

10 irrelevant to whether the facts amount to probable cause from the vantage point of an

11 objectively reasonable police officer. *Wesby*, 138 S. Ct. at 586.

12       Considering the walk-and-turn test, the Court finds that Webb has likely

13 established a dispute of fact as to whether he stepped off the line but has not established a

14 dispute of fact as to whether he missed heel-to-toe contact. *T.W. Elec. Serv., Inc.*, 809

15 F.2d at 630 (facts specifically attested to by the nonmoving party must contradict facts

16 specifically attested to by the moving party). As noted, Starks testified that on the second

17 step of the walk-and-turn test, Webb both stepped off the line and missed heel-to-toe

18 contact. Dkt. 25-3 at 20–21. Webb testified that if the report said he missed heel-to-toe,

19 he agreed to that, but he remembered his feet being perfectly straight. Dkt. 25-3 at 73. In

20 contrast, Webb declared that "[a]s [he] stated during [his] deposition," he did not believe

21 he missed heel-to-toe contact or stepped off the line. Dkt. 25-2, ¶ 4. The Court agrees

22 with Defendants that Webb's declaration contradicts his deposition testimony on the

1   issue of heel-to-toe contact without demonstrating "an honest discrepancy, a mistake, or

2   the result of newly discovered evidence" and should be disregarded as a sham attempt to

3   create a question of fact. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir.

4   1991). As noted, Decker additionally disputes whether Starks properly counted two

5   missteps and thus identified impairment on this test. Dkt. 25-1, ⁋ 29. While Defendants

6   raise multiple objections to the admissibility of Decker's declaration, Dkt. 27 at 10,

7   construing the facts in the light most favorable to Webb, only one misstep occurred, and

8   the test did not identify impairment under either Decker or Starks's criteria.

9        In any event, this dispute is not material because Defendants argue that even

10   assuming Webb performed the walk-and-turn test correctly, the remaining facts

11   supporting the arrest are sufficient for probable cause, Dkt. 27 at 7, and the Court agrees.

12   Even assuming Webb performed all the SFSTs correctly, "under the totality of

13   circumstances known to [Starks], a prudent person would have concluded that there was a

14   fair probability that [the suspect] had committed a crime.'" *Lopez*, 482 F.3d at 1072.

15        The Court finds the following facts occurring prior to the arrest and relevant

16   reasonable inferences establish probable cause was present. Starks smelled marijuana

17   coming from Webb's vehicle even before Webb pulled over, supporting an inference that

18   Webb was smoking and driving and possessed an open container of marijuana,

19   suggesting poor judgment consistent with impairment.[3] Webb failed to immediately pull

20

21        [3] It is a traffic infraction under RCW 46.61.508 to have an open container of marijuana in
    a location accessible to the driver while the vehicle is on a highway or to consume marijuana in
22   any matter in a vehicle while the vehicle is on the highway.

1   over when Starks activated his emergency lights, which the Court finds mostly neutral (as

2   Webb travelled a comparatively short distance before pulling over) but could provide a

3   slight indicator of diminished perception of distance due to impairment. Webb put away

4   his marijuana and put gum in his mouth after pulling over, which shows "nervous,

5   evasive behavior." *Wesby*, 138 S. Ct. at 588 (citation omitted). Webb's eyes were

6   bloodshot and his eyelids tremored, indicating impairment due to marijuana consumption.

7   Webb's taste buds were raised and there was a green coating on his tongue, indicating

8   consumption at a minimum. Webb told Starks that he had taken a "minimal" puff from a

9   marijuana joint and that the marijuana was still in the car. Dkt. 22-1 at 23–24; Dkt. 23 at

10   17. According to Starks's training, a single inhalation can put an individual over the legal

11   limit for THC in the blood. Dkt. 23 at 6. Considering all of these factors, the Court

12   concludes that a prudent officer would have concluded there was a fair probability Webb

13   was driving with a THC concentration above the legal limit, even though he did not drive

14   erratically or perform poorly on the SFSTs.

15       The Court finds probable cause and thus no violation of Webb's Fourth

16   Amendment rights but will also address whether the law was clearly established.

17       Regarding whether the law was clearly established, Webb argues that Washington

18   DUI law clearly establishes that probable cause was not present in these circumstances

19   because Starks had insufficient suspicion of impairment. Dkt. 25 at 18. He emphasizes

20   "[j]ust as it is legal to have a glass of wine or two over dinner and then drive, it is legal to

21   consume a moderate amount of marijuana and drive, provided the driver is not impaired

22   by the consumption at the time of driving," relying on *State v. Franco*, 96 Wn.2d 816,

1    825 (1982), *State v. Melcher*, 33 Wn. App. 357, 363 (1982), and *State v. Hansen*, 15 Wn.

2    App. 95, 96 (1976). Dkt. 25 at 18–19. While Webb's moderate consumption proposition

3    is correct, it is also true that "proof of erratic driving is not required to convict of driving

4    under the influence." *State v. Gillenwater*, 96 Wn. App. 667, 670 (1999) (citing *Hansen*,

5    15 Wn. App. at 96) (in fatal accident not caused by driver, probable cause present when

6    car contained cooler full of beer and three open cans, deceased passenger smelled of

7    alcohol, and driver smelled strongly of alcohol despite circumstances preventing field

8    sobriety tests).

9        Webb also argues that *State v. Avery*, 103 Wn. App. 527 (2000), and *Nelson v.*

10   *Cowlitz Cnty.*, No. 17-6018 RJB, 2019 WL 110980 (W.D. Wash. Jan 4, 2019), set a

11   standard for disregarding exculpatory evidence in the context of suspected impaired

12   driving. Dkt. 25 at 19, 22–24. In *Avery*, the Washington Court of Appeals found probable

13   cause lacking when balancing the defendant's having hit and killed a pedestrian, the faint

14   odor of alcohol on his breath, and his tired appearance (explained by his work schedule)

15   with his good coordination, his cooperation, and the normal appearance of his eyes and

16   face. 103 Wn. App at 541. In *Nelson*, this Court found questions of fact prevented

17   resolution of both probable cause and qualified immunity. *Nelson*, 2019 WL 110980, at

18   *10. There, the officer relied on the plaintiff's speeding, his inability to estimate his

19   speed or the posted limit, his failure to stop for some time after the officer activated his

20   lights, the smell of alcohol on his breath and red, watery eyes, that the plaintiff lied about

21   and then admitted drinking, and that the plaintiff became verbally aggressive to support

22   his claim to probable cause. *Id*. at *9–10. However, the parties disputed whether the

1   plaintiff's demeanor changed and how long the plaintiff drove before stopping. *Id.* at *10.

2   The Court notes that *Nelson* was decided over a year after the arrest in this case; Webb

3   may intend to argue it illustrates previously settled law.

4        Thus, Webb argues in effect that it is clearly established that without erratic

5   driving and without poor performance on an SFST, an officer could not reasonably

6   suspect that a driver has violated RCW 46.61.502(1) even when the driver admits to

7   smoking while driving and the officer was trained that, depending on the strength of the

8   marijuana, a first inhalation could spike the driver's THC concentration above the legal

9   limit. Webb's expert's declaration supports this rule, stating that according to the DRE

10  instructor manual, if a driver is impaired by marijuana then performance on the SFSTs

11  Starks performed "will be impaired." Dkt. 25-1, ¶¶ 30, 31, 33.[4] However as noted, Starks

12  declared that according to his training and experience, "clinical markers" such as

13  bloodshot eyes and eyelid tremors are more reliable indicators of marijuana impairment

14  than performance on the SFSTs. Dkt. 23 at 4.

15       Each case Webb relies on deals with a driver suspected to be under the influence

16  of alcohol, but Webb does not dispute that marijuana affects drivers differently than

17  alcohol. If Webb had cited caselaw clearly establishing his expert's conclusion—that for

18  *marijuana*, rather than for alcohol, the SFSTs are definitive indicators of impairment—

19  the analysis may be different. *C.f. Gillenwater*, 96 Wn. App. at 320–21 (rejecting

20  _____

21      [4] Defendants argue that the manual is publicly available and does not contain the quoted
     phrase. Dkt. 27 at 10. The Court is unable to determine whether the parties are referencing the
     same document but need not resolve this dispute as an expert declaration does not make clearly
22  established law.

1   plaintiff's proposed rule that proof of erratic driving is necessary "in any accident case

2   where the trooper is unable to employ the customary field tests."). Without that caselaw,

3   the Court finds that in the marijuana context, Webb has not met his burden to show

4   Starks violated clearly established law. In addition to finding probable cause, the Court

5   finds it was not clearly established that an officer in Starks's circumstances could not

6   "reasonably but mistakenly conclude that probable cause [wa]s present." *Anderson v.*

7   *Creighton*, 483 U.S. 635, 640 (1987).

8   **b.    Malicious Prosecution**

9   Webb alleges his Fourteenth Amendment rights were violated by being wrongfully

10  prosecuted for DUI. Dkt. 1, ¶¶ 7.1–7.12. Webb cites *Usher v. City of L.A.*, 828 F.2d 556,

11  561–62 (9th Cir. 1987), for the proposition that malicious prosecution may be a federal,

12  constitutional tort if it is "conducted with the intent to deprive a person of equal

13  protection of the laws or is otherwise intended to subject a person to a denial of

14  constitutional rights." Dkt. 25 at 25.

15  Webb argues that the relevant elements of his malicious prosecution claim arise

16  from state law as set out in *Hanson v. City of Snohomish*, 121 Wn.2d 552, 558 (1993). *Id.*

17  Those elements are:

18      (1) that the prosecution claimed to have been malicious was instituted or
        continued by the defendant; (2) that there was want of probable cause for
19      the institution or continuation of the prosecution; (3) that the proceedings
        were instituted or continued through malice; (4) that the proceedings
20      terminated on the merits in favor of the plaintiff, or were abandoned; and
        (5) that the plaintiff suffered injury or damage as a result of the prosecution.

21

22

*Id.* at 558. "Although all elements must be proved, malice and want of probable cause constitute the gist of a malicious prosecution action." *Id*. Webb argues that "the total lack of probable cause here demonstrates the malicious nature of the action, as it certainly was not based on probable cause." Dkt. 25 at 25.

Even assuming Webb is correct that state law provides the relevant elements of a malicious prosecution claim under § 1983, the claim fails. [5] Defendants are correct that malice is not inferred "from the lack of probable cause alone" under Washington law. Dkt. 27 at 11 (quoting *Youker v. Douglas Cty.*, 162 Wn. App. 448, 464 (2011)). "[F]or the inference of malice to be justified, the plaintiff must also demonstrate affirmative acts disclosing at least some feeling of 'bitterness, animosity or vindictiveness towards the appellant.'" *Youker*, 162 Wn. App at 464 (quoting *More v. Smith*, 89 Wn.2d 932, 943 (1978) (internal quotations omitted)). As the Court finds probable cause and Webb has failed to cite evidence supporting malice, two essential elements are missing, and the Court grants summary judgment for Defendants.

### c.    Additional Claims

Defendants are correct that Webb's response does not address their motion for summary judgment on his claims for for unlawful seizure of his vehicle, abuse of process, failure to disclose exculpatory evidence, and unlawful search of his mouth. Defendants

---

[5] Defendants reasonably question whether a malicious prosecution claim predicated on the Fourteenth Amendment remains available. Dkt. 21 at 17 (citing *Manuel v. City of Joliet*, 137 S. Ct. 911, 919 (2017); *Paige v. King*, 932 F.3d 898, 905 (9th Cir. 2019)). The Ninth Circuit notes that after *Manuel*, a claimant alleging legal process resulting in pretrial detention was unsupported by probable cause may require alleging a Fourth Amendment, rather than a Fourteenth Amendment violation. *Paige*, 932 F.3d at 905.

1    argue summary judgment should thus be granted on the basis that the claims are

2    abandoned. Dkt. 27 at 3 (citing *BankAmerica Pension Plan v. McMath*, 206 F.3d 821,

3    826 (9th Cir. 2000)). While *BankAmerica* more directly speaks to whether an appellate

4    court will consider issues raised in the district court but abandoned on summary

5    judgment, 206 F.3d at 826, Fed. R. Civ. P. 56(e) provides that in the absence of specific

6    facts from the opposition, a court may grant summary judgment if the motion and

7    supporting materials show that the movant is entitled to it. Moreover, Defendants assert

8    qualified immunity as to each claim and Webb has the burden to cite precedent that

9    clearly establishes a violation in the circumstances he alleges. *Tarabochia*, 766 F.3d at

10   1125. The Court briefly addresses each claim.

11           Regarding unlawful seizure of Webb's vehicle, Defendants cite *United States v.*

12   *Jensen*, 425 F.3d 698, 706 (9th Cir. 2005), for the proposition that a police officer acting

13   under the community caretaking doctrine may impound an arrested driver's vehicle left

14   where it may impede traffic. Dkt. 21 at 15. Defendants argue that the location of Webb's

15   car as demonstrated by deposition exhibits falls under the doctrine, *id*. (citing Dkt. 22-1 at

16   22–23, 63–64), and argue that Starks was following state law in effect at the time, *id*. &

17   n.6 (citing, *inter alia*, former RCW 46.55.360). As Webb does not dispute the

18   applicability of this doctrine, dispute the location of his car, or cite caselaw clearly

19   establishing a violation, Starks is entitled to qualified immunity on this claim at a

20   minimum.

21           Regarding abuse of process, Defendants are correct that it is unclear whether an

22   abuse of process claim is available under § 1983 in the Ninth Circuit. Dkt. 21 at 18

1    (quoting *West v. City of Mesa*, 708 F. App'x 288, 292 (9th Cir. 2017) ("Even assuming

2    an abuse of process claim is cognizable under § 1983 in our circuit," the plaintiff failed to

3    plead each element)). Assuming the claim is available and that the elements would mirror

4    those in state law, Defendants are correct that the Washington Court of Appeals has held

5    that the tort of abuse of process requires "an act after filing suit using legal process

6    empowered by that suit to accomplish an end not within the purview of the suit." Dkt. 21

7    at 18 (citing *Batten v. Abrams*, 28 Wn. App. 737, 748, 750 (1981)). Defendants are

8    further correct that Webb does not allege Starks took any action after filing the criminal

9    citation and supporting reports with the Battle Ground Municipal Court. *Id.* (citing Dkt.

10   23 at 7); *see also* Dkt. 1, ¶¶ 8.1–8.12. In any event, as Webb fails to meet his burden to

11   supply precedent clearly establishing a violation on the facts alleged, Starks is entitled to

12   qualified immunity on this claim at a minimum.

13   　　Regarding failure to disclose exculpatory evidence, Defendants characterize

14   Webb's claim as alleging that Starks violated his due process rights by failing to include

15   the criteria for evaluating performance on the SFSTs in the materials submitted to the

16   Municipal Court. Dkt. 21 at 19. Defendants argue that the relevant criteria are publicly

17   available and that the prosecution does not violate *Brady v. Maryland*, 373 U.S. 83

18   (1963), when it does not turn over publicly available information. Dkt. 21 at 19 (citing

19   *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006); *Johnson v. United States*, 2015 WL

20   12839788, at *4 (W.D. Wash. June 11, 2015)). The Court agrees and Webb does not

21   dispute this argument or cite precedent clearly establishing a violation in these

22   circumstances, so Starks is entitled to qualified immunity at a minimum.

1    Regarding the search of Webb's mouth, Defendants cite *United States v. Caldera*,

2    421 F.2d 152 (9th Cir. 1970) (per curiam), for the proposition that a purely visual search

3    of a suspect's mouth presents no Fourth Amendment violation and note that Webb does

4    not argue Starks threatened him, forced him to open his mouth, or otherwise physically

5    contact him. Dkt. 21 at 16–17. The Court agrees and Webb does not contest Defendants'

6    factual argument or cite other clearly established law, so Starks is entitled to qualified

7    immunity at a minimum.

8    ### 2.    *Monell* Claim

9    Webb advances two theories of liability against the City under *Monell*—first, that

10   the City had a policy or custom of arrest quotas in its police department that caused his

11   wrongful arrest and, second, that Stark's wrongful arrest was ratified by a final

12   policymaker for the City. Dkt. 25 at 26. Webb has filed a motion to defer consideration of

13   summary judgment under Fed. R. Civ. P. 56(d) based on outstanding discovery about

14   arrest quotas, Dkt. 26, and a motion to compel, Dkt. 30.

15   Webb's discovery request consists of: (1) an interrogatory asking for the number

16   of police officers currently employed with the Vancouver PD who have any type of

17   employment record referencing a numerical goal or minimum number of citations or

18   arrests; (2) a request for admission that police officers currently employed with the

19   Vancouver PD have such records in their employee files; and (3) a request for production

20   of such records. Dkt. 26-1 at 9–10. Webb did not provide a separate affidavit or

21   declaration explaining how this discovery would create a question of fact on summary

22

judgment, stating instead that "[a]s explained in the response, the evidence of these

unethical arrest quotas is relevant to the *Monell* claim." Dkt. 26 at 2.

However, there is no basis for *Monell* liability as the Court found no underlying

constitutional violation. *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

Moreover, Webb failed to satisfy Fed. R. Civ. P. 56(d)'s requirement to articulate through

affidavit or declaration the dispute of fact the discovery he seeks would create—he has

failed to explain how the additional discovery is essential rather than generically relevant

to his claim. *See Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525

F.3d 822, 827 (9th Cir. 2008). Webb also does not contest Defendants' assertion that he

had developed his quota theory by July 10, 2020, as demonstrated by his deposition

questions to Hatley and Lester, but did not seek additional discovery until after

Defendants filed their motion for summary judgment on September 3, 2020. Dkt. 29 at

12; *see Pfingston v. Ronan Engineering Co.*, 284 F.3d 999, 1005 (9th Cir. 2002) ("The

failure to conduct discovery diligently is grounds for denial of a Rule 56[d] motion.").

This lack of diligence is also fatal to a motion to compel filed outside the deadline for

discovery motions. *See* Fed. R. Civ. P. 16(b)(4); *Johnson v. Mammoth Recreations, Inc.*,

975 F.2d 604, 609 (9th Cir. 1992) (if moving party was not diligent, inquiry should end).

The motions are therefore denied.

1

## IV.  ORDER

2     Therefore, it is hereby **ORDERED** that Defendants' motion for summary

3 judgment, Dkt. 21, is **GRANTED**, and Webb's motions to continue, Dkt. 26, and to

4 compel, Dkt. 30 are **DENIED**.

5     The Clerk shall enter a **JUDGMENT** and close the case.

6     Dated this 19th day of November, 2020.

7

8                        

9                   BENJAMIN H. SETTLE
                  United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22